UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY CARTER,

      Petitioner,

                             Case No. 1:09-cv-215

v.                                  Hon. Robert J. Jonker

BLAINE C. LAFLER,

      Respondent.

_____/

**REPORT AND RECOMMENDATION**

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. The petition was dismissed and is now before the Court on remand from the Sixth Circuit Court of Appeals.

**I.      Background**

This case arose from the September 28, 2000 robbery of a Speedway gas station in Grand Rapids, Michigan. On May 9, 2001, after a trial in the Kent County Circuit Court, a jury convicted petitioner of armed robbery, M.C.L. § 750.529, and possession of a firearm during the commission of a felony, M.C.L. § 750.227b. *People v. Gregory Carter*, No. 235590, 2003 WL 1795513 at *1 (Mich. App. April 3, 2003). Petitioner was sentenced to two years incarceration for the felony firearm charge, to be served consecutive "to the term of incarceration which he's currently serving and for which he was on parole at the time of this offense." Sent. Trans. (docket no. 11, PageID.190). In addition, petitioner was sentenced to a term of 15 to 40 years in prison for the armed robbery conviction, consecutive to the felony firearm sentence. *Id.*

Petitioner presented three issues in his direct appeal to the Michigan Court of Appeals:

> I.     Did the court err by allowing a police officer to testify as to her impressions of alleged statements made by [petitioner] in tape-recorded statements from the jail without a proper foundation for admission and in violation of the best evidence rule, denying [petitioner] his due process right to a fair trial?
>
> II.    Was [petitioner] denied the effective assistance of counsel where counsel failed to file an alibi notice or to investigate and prepare an alibi defense?
>
> III.   Did the trial court abuse its discretion in denying counsel's motion to withdraw?

*See* Brief on Appeal (docket no. 15).  The Michigan Court of Appeals affirmed the conviction. *People v. Gregory Carter*, No. 235590.  Petitioner did not appeal any of these issues to the Michigan Supreme Court.  *See* Corbin R. Davis Affidavit (docket no. 12).

On October 27, 2003, the state trial court entered an opinion and order denying petitioner's motion for relief from judgment, identifying petitioner's three claims as follows:

> In his pleadings, Defendant seeks Relief from Judgment pursuant to MCR 6.501 on the grounds that he was denied his right to a fair trial due to flaws in the Kent County jury selection which he alleges "systematically excluded" minorities from the jury pool, ineffective assistance of counsel, and resentencing.

Opinion and Order at 1 (docket no. 13).

Petitioner's first two claims are relevant to this habeas action.  The trial court set forth the following analysis with respect to the jury issue:

1.  Systematic Exclusion of Minorities from the Jury Pool

> In 2001, Kent County's jury selection process came under intense media scrutiny.  It was alleged that the system was fundamentally flawed, leading to a systematic exclusion of minority jurors from the jury pool.  Following media

coverage of this problem, the County determine that a flaw in the random computer process could, in fact, lead to the disproportionate exclusion of minorities from the jury pool. The system was subsequently corrected.

Following this revelation many defendants requested new trials on the basis that they were denied their constitutional right to a fair trial by virtue of this flawed system. The Court of Appeals addressed this issue recently in *People v. McKinney*, ___ Mich App ___; ___ NW2d ___ (2003) (Slip copy). In this case the defendant claimed that African-Americans were "systematically excluded from Kent County's jury venires when her trial was conducted." *Id.* at ___. The defendant in this case cites the same newspaper articles that the defendant in the instant matter has attached as exhibits. The Court of Appeals stated:

> Questions concerning the systemic exclusion of minorities in jury venires are generally reviewed de novo. *People v. Hubbard (After Remand)*, 217 Mich.App. 459, 472, 552 N.W.2d 493 (1996). "A criminal defendant is entitled to an impartial jury drawn from a fair cross section of the community." *Id.*, citing *Taylor v. Louisiana*, 419 U.S. 522, 526-531, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). To establish a prima facie violation of the fair cross-section requirement, the defendant bears the burden of proving "that a distinctive group was underrepresented in his venire or jury pool, and that the underrepresentation was the result of systematic exclusion of the group from the jury selection process." *People v. Smith*, 463 Mich. 199, 203, 615 N.W.2d 1 (2000), *citing Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

The Court of Appeals went on to deny the request for a new trial because defendant had not raised the issue before the jury was empannelled and sworn. *Id.* at ___. *See also People v. Dixon*, 217 Mich App 400, 404; 552 NW2d 663 (1996). Likewise, the defendant in the instant matter failed to raise this as an objection during his trial, and the motion for a new trial should similarly be dismissed.

*Id.* at 2-3.[1]

The trial court also denied petitioner's ineffective assistance of counsel claim,

providing in pertinent part as follows:

---

[1] The Michigan Court of Appeals decision in *McKinney* has since been published as *People v. MicKinney*, 258 Mich. App 157; 670 NW2d 254 (2003).

3

The Defendant's argument, in sum, is that his trial counsel was ineffective due to his failure to investigate a possible alibi defense. The defendant alleges that he was at a treatment facility in Illinois at the time of the incident. However, this defense was raised on the evening following the first day of the trial. Furthermore, the defense counsel did contact the treatment facility and was informed that the Defendant had not been admitted to the program. Additionally, the defense counsel attempted to contact the Defendant's parole officer, but was unable to do so. The Defendant, therefore, has failed to establish that the defense counsel acted unreasonably under the circumstances, and his claim of ineffective assistance of counsel must fail. *People v. Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000).

*Id.* at 4.

The court summarized it decision denying petitioner's claims as follows:

During his trial, the Defendant did not object to the composition of the jury, and therefore, this issue was not properly preserved and can not constitute grounds for a new trial pursuant to MCR 6.500. Likewise, Defendant has not met the burden necessary under *People v. Pickens*, 446 Mich298, 314; 531 NW2d 797 (1994) which adopted the test for ineffective assistance of counsel that was articulated in *Strickland v. Washington*, 446 US 668, 694; 104 Sct 2052; 80 LE2d 674 (1984). Furthermore, Defendant's allegations of error relating to his sentence are without merit.

*Id.* at 1.

Petitioner filed a delayed application for leave to appeal this order to the Michigan Court of Appeals, raising two issues (in his words):

I.      Did the trial court rule erroneously, when it rule that by defendant counsel failure to object to the composition of the jury at trial, therefore, his issue was not properly preserved and can not constitute ground for a new trial pursuant to MCR 6.500.

II.     Was the defendant denied his United States Sixth and Fourteen Amendments rights to representation by an jury from a fair cross-section of the community. Whereas, there was a serious flaw in the Kent County computerized jury selection system which systematically excluded minority jurors from the jury pool.

Application for leave to appeal (docket no. 13).

4

The Michigan Court of Appeals denied the delayed application "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Gregory Carter*, No. 254482 (Mich. App. Aug. 20, 2004) (docket no. 13). Petitioner raised the same two issues in his application for leave to appeal to the Michigan Supreme Court, which denied the application "because defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Gregory Carter*, No. 127081 (Mich. May 31, 2005).

Petitioner filed a federal habeas petition in the Eastern District of Michigan on February 9, 2006, raising the following issue (in his words):

> Whether or not petitioner was denied due process of law in violation of his Sixth and Fourteenth Amendments of the United States Constitution to be represented by a jury from a fair cross section of the community, whereas, there was a serious flaw in the selection process of the Kent County jury selection pool which was programmed to systematically exclude minorities from the jury selection process.

Petition at ¶ 13 (docket no. 1). In his attached memorandum of law, petitioner also argued that the trial court "ruled erroneously when it ruled that by petitioner's counsel's failure to object to the composition of the [jury] at trial, therefore, the issue was not properly preserved and cannot constitute grounds for a new trial pursuant to MCR 6.500." *Id.* at p. 17. In his answer, respondent asserted that petitioner's claim regarding the systematic exclusion of minorities from the jury pool was barred from habeas review by procedural default in the state court. In petitioner's reply, he referred to a Grand Rapids Press newspaper article from October 20, 2002, in which the Kent County Circuit Court's Chief Judge acknowledged the problem. Petitioner also asserted that a competent attorney could not have provided assistance under these circumstances, because the flaw in the jury selection procedure was discovered long after his trial.

5

In reviewing the petition, a magistrate judge in the Eastern District summarized two newspaper articles from the *Grand Rapids Press* which addressed the "computer glitch" which resulted in the omission of eligible jurors with certain ZIP codes in Kent County. *See* Report and Recommendation ("R&R") (July 2, 2008) (docket no. 26, PageID.338-339). The magistrate judge concluded that while petitioner's jury selection claim was procedurally defaulted, the procedural default should be excused because "neither petitioner nor his counsel had any reason to suspect that the fair cross-section requirement had been violated, nor any reason to conduct an investigation into Kent County's jury selection practices." *Id.* at PageID.341. In excusing the procedural default, the magistrate judge did not address the issue of prejudice. *Id. See Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (review of a federal habeas claim can be excused where "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law"). Nevertheless, the magistrate judge concluded that an evidentiary hearing was necessary. R&R (July 2, 2008) at PageID.344.

In its order adopting the R&R, the district court adopted the recitation of facts as set forth by the magistrate judge and expressed its belief that an evidentiary hearing was proper because petitioner had not had an opportunity to show his prima facie case under *Duren v. Missouri*, 439 U.S. 357. Opinion and Order (docket no.29, PageID.359, 367). The court concluded that the claim was procedurally defaulted, but found that there was cause for the default:

> Here, as set forth by the Magistrate Judge, the factual basis of petitioner's fair cross-section claim was reasonably unknown to Petitioner and his counsel at the time the jury was sworn. The alleged systematic exclusion resulted from an unknown computer glitch that was not discovered until several months after Petitioner's conviction. Petitioner may assert ineffective assistance of counsel as cause for his procedural default.

6

*Id.* at PageID.363.  After ruling on these issues, the district court transferred this habeas action to the Western District "for an evidentiary hearing and determination on the Sixth Amendment claim." *Id.* at PageID.367.

After transfer to the Western District, a magistrate judge entered a report which respectfully disagreed with the previous order for an evidentiary hearing.  *See* R&R (Dec. 18, 2009) (docket no. 39).  While the magistrate judge concluded that petitioner's habeas claim was procedurally defaulted, he recommended that this Court reconsider the previous determination that petitioner had demonstrated cause for the procedural default:

> Where "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  A procedural default "provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice." *Gray v. Netherland*, 518 U.S. 152, 162 (1996).  Not every state procedural rule will warrant application of the procedural default doctrine.  Only a procedural rule that was "'firmly established and regularly followed' by the time as of which it [was] to be applied," *Ford v. Georgia*, 498 U.S. 411, 424 (1991), will support application of the doctrine.  "For a habeas claim to be procedurally defaulted on the basis of a state procedural rule, the petitioner must have violated a procedural rule, but the state court must also have based its decision on the procedural default." *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000).  MCR 6.508(D) is a valid procedural bar for habeas purposes.  *See Canty v. Cason*, No. 02-2030, 2003 WL 152322 (6th Cir. Jan. 16, 2003); *Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002); *Luberda v. Trippett*, 211 F.3d 1004, 1008 (6th Cir. 2000).

> The Kent Circuit Court was the first state court to review petitioner's habeas claims, which were raised in his motion for relief from judgment under MCR 6.500 *et seq*.  Both the Michigan Court of Appeals and the Michigan Supreme Court denied petitioner's application for leave to appeal the trial court's order denying post-judgment relief because he failed to meet the burden of establishing entitlement to relief under MCR 6.508(D).  As the last state court rendering judgment in the case,

the Michigan Supreme Court's decision denying petitioner's claims on the basis of the state procedural bar of MCR 6.508(D) prevents habeas review. *See Burroughs*, 282 F.3d at 414; *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000). Accordingly, petitioner's claims are procedurally defaulted. *See* Order of Transfer at pp. 4-5.

However, the undersigned concludes that this court should re-consider the Order of Transfer to the extent that order found that petitioner had shown good cause to excuse the procedural default. The "good cause" determination is inconsistent with previous decisions entered in this district in similar cases. *See, e.g.*, *Wellborn v. Berghuis*, No. 1:05-cv-346, 2009 WL 891708 at *21-27 (W.D. Mich. March 31, 2009), appeal pending, No. 09-1539 (6th Cir.); *Burros v. Curtin*, 1:05-cv-701, 2009 WL 736066 at *5-12 (W.D. Mich. March 18, 2009).

Since petitioner procedurally defaulted this claim in state court, the claim is barred unless he demonstrates either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536-37 (2006)*; Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks v. Straub*, 377 F.3d 538, 551-52 (6th Cir. 2004).

To show cause sufficient to excuse a failure to raise claims on direct appeal, petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *McCleskey v. Zant*, 499 U.S. 467, 497 (1991); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Petitioner's claim arises from the Sixth Amendment's guarantee that a criminal defendant shall have an impartial jury drawn from a fair cross-section of the community. *Duren v. Missouri*, 439 U.S. 357, 358-59 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 526-31 (1975). The petit jury does not have to mirror the community, but distinct groups cannot be systematically excluded from the venire. *See, United States v. Jackman,* 46 F.3d 1240, 1244 (2nd Cir. 1995). To establish a *prima facie* violation of the fair cross-section requirement, petitioner bore the burden of proving "that a distinctive group was under-represented in his venire or jury pool, and that the under-representation was the result of systematic exclusion of the group from the jury selection process." *People v. Smith,* 463 Mich. 199 (2000), citing *Duren v. Missouri, supra*.

While petitioner bases the present habeas claim on the ground that he "was found guilty by an all white jury," Petition at p. 4, he did not challenge the jury array at trial. If petitioner felt the jury venire was unbalanced, he did not say so. Rather, at the close of the jury voir dire, petitioner's counsel stated that "the defense is satisfied." Trial Trans. at 72 (May 7, 2001) (docket no. 8). The jury was then

8

empaneled and sworn.  There were no objections regarding the composition of the jury array at any time during the trial, much less the voir dire, and trial counsel's statement constituted an express waiver of the issue.  Petitioner did not raise this issue in his direct appeal.  Rather, he first raised it in his motion for relief from judgment.  At that time, petitioner apparently relied on a newspaper article from October 20, 2002 to support his claim that Kent County's jury selection process "was programmed in a manner that it would systematically exclude minorities from the jury selection pool."  Petitioner's Memorandum of Law at 4.

For cause, petitioner contends that the error was not procedurally defaulted because the flaw in the jury selection process, i.e., the under-representation of African Americans, was not discovered until after he filed his appeal of right.  The court disagrees.  Simply seeing an array when the deficiency is apparent provides a defendant and his attorney with adequate notice.  Petitioner did not need to know the precise nature of the computer problem to object to the lack of African Americans on the jury array.

R&R (Dec. 18, 2009) at PageID.423-426.  Ultimately, the magistrate judge concluded that petitioner did not demonstrate cause for the procedural default.  *Id.* at PageID.426-429.

After finding no cause, the magistrate judge concluded that the procedural default was not excused:

Petitioner's failure to demonstrate cause for his procedural default prevents federal review of  his habeas claims unless the court's failure to do so will result in a "fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 537.  A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (*citing Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  Petitioner has made no such claim or showing of actual innocence in this case.

Accordingly, petitioner's claim is procedurally barred on habeas review.

*Id.* at PageID.429 (footnote omitted).

The district judge adopted the recommended disposition and dismissed the petition.

*See* Order Approving R&R (docket no. 42); Judgment (docket no. 43).  However, the Court issued

9

a certificate of appealability on whether petitioner's due process claim was barred by procedural default.  Order Approving R&R at PageID.446-447.

Petitioner appealed the decision to the Sixth Circuit, where his case was joined with two other cases, *Ambrose v. Booker*, 781 F. Supp.2d 532 (E.D. Mich. 2011) ("*Ambrose I*"), and *Wellborn v. Berghuis*, 1:05-cv-346 (W.D. Mich. March 31, 2009), which involved the same alleged computer problem in the jury selection.  *See Ambrose v. Booker*, 684 F.3d 638 (6th Cir. 2012) ("*Ambrose II*").  However, the three cases reached different results, i.e., the habeas petition was granted in *Ambrose* and denied in *Carter* and *Wellborn*.  As discussed, *infra*, the Sixth Circuit reversed and remanded all three cases in *Ambrose II*.

As an initial matter, the Sixth Circuit summarized petitioner's claim as follows:

These habeas petitions involve the far-reaching effects of an unintentional computer glitch that caused the systematic underrepresentation of African-Americans in the jury pools of Kent County, Michigan.  The three petitioners received separate jury trials in Kent County in either 2001 or 2002.  At jury selection, the petitioners did not object to the racial composition of their respective jury venires, and were subsequently convicted.  A few months later, the Grand Rapids Press published a story detailing how Kent County's jury selection software had a computer glitch that had systematically excluded African-Americans from the jury pool.  In light of these revelations, the petitioners each filed motions for post-conviction relief in state court. The state court found that the petitioners had waived these claims by failing to object to the racial composition of the jury venire during voir dire.

*     *     *

Gregory Carter's habeas petition was reviewed by both the Eastern and Western Districts of Michigan, which came to opposite conclusions.  A jury convicted Carter of armed robbery of a convenience store in Kent County, Michigan. At trial, the prosecution presented "overwhelming" evidence of the robbery, including a videotape which showed Carter robbing the store.  *Carter v. Lafler*, No. 1:09-cv-215, 2010 WL 160814, at *1 (W.D. Mich. Jan. 8, 2010).  Petitioner was sentenced to two years' incarceration for a felony firearm charge to be served consecutively with a term of 15 to 40 years' imprisonment for the armed robbery.

10

*Id.* Carter did not object to the venire panel at trial, and did not challenge the panel's composition at any stage of his direct appeal.

In light of the revelations about the problems with Kent County's jury selection system, Carter initiated state post-conviction proceedings under M.C.R. 6.501. In his motion, Carter challenged the composition of the jury based on flaws in the Kent County jury selection system, and raised an ineffective assistance of counsel claim. The trial court denied the motion, reasoning that Carter had defaulted by failing to object to the venire's composition before the jury was empaneled. Further, the trial court found that Carter's ineffective assistance of counsel claim failed under Michigan's version of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Carter applied for leave to appeal, but both the Michigan Court of Appeals and Michigan Supreme Court denied the application "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Carter*, No. 254482 (Mich. App. Aug. 20, 2004); *People v. Carter*, 472 Mich. 912, 696 N.W.2d 714 (2005) (table opinion).

Carter filed a habeas petition in the United States District Court for the Eastern District of Michigan. The district court held that there was cause and prejudice to excuse Carter's procedural default. *Carter v. Lafler*, No. 06-cv-10552, 2009 WL 649889, at *3 (E.D. Mich. Mar. 10, 2009). The district court recognized that Carter had procedurally defaulted by failing to object at trial to the composition of the venire panel. The default was excused, however, because the district court found that Carter could not have known about the systematic exclusion caused by the computer glitch at the time the jury was sworn. *Id.* Having excused the default, the court determined that an evidentiary hearing was necessary to determine whether Carter's jury was empaneled during the period impacted by the computer glitch. *Id.* at *4-5. Because Carter was imprisoned in the Western District of Michigan, and because the trial had occurred in the Western District, the court transferred the action "for an evidentiary hearing and determination on the Sixth Amendment claim." *Id.* at *5.

Upon receiving the case, the Western District of Michigan assigned the case to a magistrate judge. The magistrate judge recommended that the district court deny the habeas petition as procedurally defaulted without an evidentiary hearing. *Carter v. Lafler*, No. 1:09-cv-215, 2010 WL 160814, at *4-13 (W.D. Mich. Jan. 8, 2010). The district court adopted this recommendation because the court determined that Carter had not shown good cause for his procedural default. *Id.* at *3. Although Carter was unaware of the computer glitch at the time of his trial, the district court held that the racial composition of the jury venire gave him notice of his claim. *Id.* Carter timely appeals.

*Ambrose II*, 684 F.3d at 640, 643-44 (6th Cir. 2012).

Ultimately, the Sixth Circuit found that this Court erred in finding that petitioner did not demonstrate cause to excuse the procedural default, stating in pertinent part:

> There is no dispute that petitioners defaulted their claims by failing to object to the jury venire at trial, in violation of Michigan's contemporaneous objection rule. *See, e.g., People v. Dixon*, 217 Mich. App. 400, 552 N.W.2d 663, 667 (1996). However, petitioners have shown "cause and prejudice" sufficient to excuse the default under *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The cause inquiry "ordinarily turn[s] on whether . . . some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," and is satisfied by "a showing that the factual or legal basis for a claim was not reasonably available to counsel." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). As discussed below, petitioners have shown cause because the factual basis for the claim -- the computer glitch – was not reasonably available to counsel, and petitioners could not have known that minorities were underrepresented in the jury pool by looking at the venire panel. Moreover, the Supreme Court has found cause to excuse a procedural default in a factually similar case. *See Amadeo v. Zant*, 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988).

*Id.* at 645.

However, the Sixth Circuit did not address whether petitioners met the "prejudice" prong sufficient to excuse a procedural default. Rather, that court remanded the cases to their respective trial courts for a determination of whether actual prejudice existed, instructing the courts to utilize the prejudice standard for ineffective assistance of counsel claims set forth in *Strickland v. Washington*, 466 U.S. 668 (1984):

> Because the district courts here did not address actual prejudice, a remand is necessary. We are then left with the question of the proper standard on remand. We are guided in part by the Eleventh Circuit's analysis of a similar question in *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir.1991). In that case, the petitioner claimed that his counsel was ineffective for failing to object to Alabama's systematic exclusion of African-American jurors from grand and petit juries. To excuse this default, the *Hollis* court required that petitioner show actual prejudice, which involved determining whether there was a reasonable probability that "a properly selected jury [would] have been less likely to convict." *Id.* at 1482. The Eleventh Circuit's analysis is persuasive. The most important aspect to the inquiry is the strength of the case against the defendant. As the Eleventh Circuit reasoned, "a

transcript could show a case against [petitioner] so strong, and defense so weak, that a court would consider it highly improbable that an unbiased jury could acquit." *Id.* at 1483 (internal quotation marks omitted). In that circumstance, actual prejudice would not be shown.

Although the instant petitions do not involve a *Strickland* claim, this standard is appropriate because it balances the competing demands of constitutionally protected equal protection interests and comity toward the state courts. We recognize that the application of the actual prejudice standard in cases such as these presents a particularly challenging charge to the district courts below to answer the question, "what would have happened?" The law nonetheless requires that the question be answered – with a careful look at the transcripts involved, and with judgment that takes into account a fair balance of the competing interests of comity toward the final judgments of the state's criminal processes and the protection of constitutional equal protection interests.

*Ambrose II*, 684 F.3d at 652 (footnote omitted).

On remand, this Court appointed as petitioner's counsel, Attorney Bradley R. Hall of the Federal Defender Office for the Eastern District of Michigan, who was also counsel for the petitioner in the Eastern District case of *Ambrose v. Booker.* The Eastern District case proceeded as the *de facto* lead case on remand. Order (docket no. 60); *see* Order granting "Stipulation to adjourn briefing schedule in anticipation of evidentiary hearing in *Ambrose v. Booker*" (docket no. 68). This Court also appointed Attorney Hall as counsel for petitioner in *Wellborn v. Berghuis,* 1:05-cv-346 (Order, docket no. 57). On September 16, 2013, the court held an evidentiary hearing in *Ambrose v. Booker*, in which petitioner called an expert witness, Samuel Sommers, Ph.D., who "essentially testified that a more diverse jury would have been less likely to convict Ambrose because African-American jurors are statistically less likely to convict than their Caucasian counterparts." *Ambrose v. Booker*, 24 F. Supp. 3d 626, 640 (E.D. Mich. 2014) ("*Ambrose III*").[2] Ultimately, the court concluded that "[b]ased on Dr. Sommers's testimony, and the fact that there

---

[2] The Court notes that a transcript of Dr. Sommers' testimony appears as docket no. 72-3.

is a reasonable probability that a properly selected jury in Ambrose's case would have included at least one African American, Ambrose has demonstrated actual prejudice to excuse his default so long as the evidence against him was not overwhelming." *Id.* at 653. The court went on to address the merits of the claim and found that "Ambrose has satisfied his prima facie showing of a violation of the fair cross-section requirement; a showing that has not been rebutted by the State. His habeas petition will be granted." *Id.* at 658.

Respondent appealed and, once again, the Sixth Circuit reversed. *See Ambrose v. Booker*, 801 F.3d 567 (6th Cir. 2015) ("*Ambrose IV*"). In *Ambrose IV*, the Sixth Circuit found that the district court applied the wrong prejudice standard on remand and reiterated that the actual prejudice standard in *Strickland* applied:

> As an initial matter, the district court on remand should not have applied a less stringent *Hollis* – rather than the *Strickland* – prejudice standard to determine whether to excuse Ambrose's procedural default. The "actual prejudice" inquiry outlined in *Ambrose v. Booker*, 684 F.3d 638, 652 (2012), was intended to mirror the inquiry required by *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Courts must consider whether, in light of the underrepresentation of African Americans in the jury venire, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Stated another way, courts must ask, is there a reasonable probability that a different (e.g., properly selected) jury would have reached a different result, "a probability sufficient to undermine confidence in the outcome of the trial." *Id.*

*Ambrose IV*, 801 F.3d at 577-78.

Next, the Sixth Circuit stated that the district court in *Ambrose III* should not have relied on Dr. Sommers' testimony in reaching its result:

> The district court also should not have relied on Dr. Sommers' expert testimony – in which Dr. Sommers stated that racially diverse juries are less likely to convict than all-white juries – in making the court's "actual prejudice" determination. Dr. Sommers' testimony is not relevant to the "actual prejudice"

determination because it: (1) does not support a finding that a different jury would have reached a different result; (2) lacks any individualized assessment of the case against Ambrose; and (3) relies on impermissible racial stereotypes.

*Id.* at 579 (6th Cir. 2015).

Then, the Sixth Circuit found that petitioner did not demonstrate actual prejudice, stating in pertinent part:

> Ultimately, under the stricter *Strickland* standard, and without consideration of Dr. Sommers' testimony, Ambrose has failed to show actual prejudice to excuse his procedural default. Though a careful review of the record reveals some inconsistencies in the trial testimony of the two victims, and the prosecution, admittedly, failed to explain why Ambrose – after carjacking the victims at gunpoint and stealing their possessions – would later abandon the car with a cell phone, gold and silver jewelry, and a watch still inside, these issues on their own do not create a reasonable probability that a different jury would have reached a different result, a probability sufficient to undermine confidence in the outcome. "The most important aspect to the [actual prejudice] inquiry is the strength of the case against the defendant," which requires courts to take a "careful look at the transcripts involved."

*Id.* at 580. After reviewing the record, the Sixth Circuit concluded that "[b]ecause Ambrose failed to show actual prejudice to excuse his procedural default, his petition for writ of habeas corpus should have been denied." *Id.* at 582. Finally, petitioner sought a writ of certiorari, which the Supreme Court denied on June 13, 2016. *See Ambrose v. Romanowski*, 136 S. Ct. 2461 (2016). Based on this record, the Court is to evaluate petitioner's claim by applying the actual prejudice standard announced in *Ambrose II*, as clarified in *Ambrose IV*.

## II.    Evidence presented at trial

### A.    Prosecution's case in chief

#### 1.    Testimony of Jessie Adrianson

On September 28, 2000, Ms. Adrianson (sometimes referred to as the "victim") was managing a Speedway gas station in Grand Rapids, Michigan. Trial Trans. II (docket no. 9,

PageID.143).[3]  At approximately 9:40 p.m., petitioner walked in holding a pistol, held the pistol up to her and said, "Give me the money." *Id.*  Adrianson gave him all of the cash in the drawer. *Id.* Petitioner told her to lift the drawer out. *Id.*  She complied, but there was nothing underneath it. *Id.* Then, petitioner told her, "That's not all you have." *Id.*  Ms. Adrianson, being afraid that petitioner was going to shoot her, opened up the second drawer and gave him all of the cash out of that register. *Id.*  She gave petitioner approximately $200.00 total from two cash registers. *Id.* at PageID.144. After she gave him the money, petitioner wanted a carton of Kool cigarettes, which she gave him. *Id.*  Petitioner shoved the money in his pocket and put the pistol down into his pants, in the waistband. *Id.*  When petitioner left, "he just kind of waived [sic] the cigarettes, and said, 'Don't call the police.'" *Id.*

Ms. Adrianson saw him walk around the back of the building, towards a park. *Id.* at PageID.144-145.  She made eye contact with him again through the windows. *Id.* at PageID.145. In Ms. Adrianson's words, "I watched him -- watched his face as he walked around the building." *Id.*  As soon as petitioner walked around the building, she "locked the door and pushed the panic button." *Id.*  It was unnecessary for her to call the police, who arrived a couple of minutes later. *Id.* When the police arrived, she gave the following description to an officer:

> I told him it was a black male, 5'9", 5'10"; he had a light mustache; he had braids in his hair closely braided to his head; he had earrings in his ears, small hoop earrings; he had a black -- like a fleece zip-up shirt, blue jeans and tennis shoes.

*Id.* at PageID.148.

---

[3] The Court notes that the transcript from the first day of trial is designated "Transcript of Trial - Volume II," while the transcript from the second day of trial is designated as "Transcript of Trial - Volume I."

At trial, Ms. Adrianson positively identified petitioner as the robber. *Id.* at PageID.143. After eliciting testimony from Ms. Adrianson about the use of security cameras at the store, the prosecution played a videotape of the robbery for the jury, with explanations provided by the victim, and still photographs from the videotape were admitted into evidence. *Id.* at PageID.145-147.[4] Ms. Adrianson identified petitioner as the person depicted in the photographs robbing the store. *Id.* at PageID.145-148.

Ms. Adrianson was shown a photographic line-up on October 10, 2000, but did not identify anyone from the six photographs shown to her on that date. Trial Trans. II at PageID.150; Trial Trans. I (docket no. 10, PageID.167). Petitioner's picture was not among the photographs shown to her at that time. Trial Trans. II at PageID.151. Then, on December 21, 2000, police contacted Ms. Adrianson to view a line-up. *Id.* at PageID.148. The police brought between six and eight men into a room where they could be seen but could not see the witness. *Id.* The detectives told Ms. Adrianson they thought they had a suspect, but needed her to identify the suspect if he was present in the lineup. *Id.* All of the individuals in the lineup were also asked to speak. *Id.* at PageID.150. Ms. Adrianson identified petitioner in the lineup and was "absolutely positive" that he was the man who robbed her. *Id.* at PageID.149.

### 2. Testimony of Grand Rapids Police Department (GRPD) Officer Jonathan Baak

GRPD Officers Baak and William Nowicki were dispatched to the scene of the robbery on September 28, 2000. *Id.* at PageID.151-152; *see also*, Officer Nowicki's testimony at PageID.156. Officer Baak interviewed Ms. Adrianson, who described the robber as a black male in his mid-30's; 5'8-to-5'9; 160-to-170 pounds; with hair braided close to the scalp and longer in the

---

[4] The photographs appear in this Court's record as docket no. 81.

back; and, wearing a black long sleeved fleece pull-over, blue jeans, and white tennis shoes.  *Id.*  at PageID.152.  She also described the robber as having "light mustache bumps on the face, and an earring in both ears."  *Id.*  She described the weapon as "a large, silver colored handgun."  *Id.*

### 3.      Testimony of GRPD Officer Nowicki

GRPD Officer Nowicki, who secured the scene with Officer Baak, received information concerning a car that may have been used in the robbery.  *Id.* at PageID.156.  A Kent County Sheriff's Department Detective met them at the scene and told Nowicki that a suspicious vehicle had been seen that evening casing another gas station in Ada, Michigan.  *Id.* at PageID.156-157.  Nowicki reported the description of the vehicle, and sent two officers to the address listed on the car's registration at 1211 Beamus Street.  *Id.*  Nowicki went to the address when the officers on the scene reported that the car had arrived.  *Id.*  The car was registered to Irene Carter (petitioner's mother).  *Id.*; *see* Trans. I at PageID.166.  There were two occupants of the car,  a man and a woman, Mario Shanklin and Shakerva Mack, neither of whom matched the appearance of the person who was on the gas station videotape.  Trans. II at PageID.156-157.  On cross-examination, Officer Nowicki admitted that he did not take a picture of Shanklin or have any further contact with him.  *Id.* at PageID.157-158.  However, Officer Nowicki testified that he had previously watched the videotape of the robbery, that he knew what the suspect looked like, and that he knew that Shanklin was not that person.  *Id.* at PageID.158.

### 4.      GRPD Officer Kim Hartuniewicz

Officer Hartuniewicz, a canine handler for the police, was called to the robbery scene to determine if the police dog could pick up a scent and track it.  *Id.* at PageID.153.  The police dog picked up a scent and followed it to a parking lot south of the gas station, where he lost the scent.

*Id.* Officer Hartuniewicz testified that a dog will generally lose a scent if the person that is the subject of the track either got into a car or on a bike. *Id.* On cross-examination, Hartuniewicz admitted that there was nothing belonging to the robber to give the police dog a basis for a scent; she took the police dog to the suspect's last known location, then followed the scent from that point. *Id.* at PageID.154.

### 5. Testimony of GRPD Officer David Kiddle

Officer Kiddle testified that on December 18, 2000, he was on patrol when he stopped a car for having a license plate that did not belong on that vehicle. *Id.* at PageID.155. Petitioner, his wife, Linda Carter, and his daughter were in the car. *Id.* Petitioner did not have a license, and told Officer Kiddle that his name was Donald Brown. *Id.* Petitioner's wife told Kiddle that petitioner was her nephew, Donald Brown. *Id.* When Kiddle checked for a driving record on Donald Brown, he found none. *Id.* He arrested petitioner for driving without a license and gave him a ticket for improper registration. *Id.* After petitioner was transported to jail and the car towed, Officer Kiddle received information that the car might have been used in a robbery that took place "approximately" a month earlier. *Id.* On cross-examination, Kiddle acknowledged that people driving without a license or suspended licenses give false names "a lot." *Id.* at PageID.156.

### 6. Testimony of GRPD Officer William Corner

GRPD Officer Corner arrived at the scene of the robbery to assist in securing the area. Trial Trans. I (docket no. 10, PageID.162). He interviewed a bystander, Cassandra Butler, who told him that she was afraid that her ex-boyfriend, Roderick Jones, was possibly the person who committed the robbery. *Id.* Office Corner had Ms. Butler examine the videotape, and after doing so, Butler said that the person in the videotape was not Roderick Jones. *Id.* at PageID.162-163. On

19

cross-examination, Corner testified that he tried to get an address for Roderick Jones, but Butler could not provide him with one. *Id.* at PageID.163. In addition, the police department had no information on Roderick Jones or his location. *Id.* Officers went to several locations that night to locate suspects, but had no success. *Id.*

### 7.     Testimony of GRPD Officer William Wolz

GRPD Office Wolz, a fingerprint examiner, testified that he checked a number of finger and palm prints that were found on the north entry door. *Id.* at PageID.163-164. However, none of the prints were identified. *Id.*

### 8.     Testimony of GRPD Detective Erica Clark

Detective Clark was assigned to investigate the robbery within a day after it occurred. *Id.* at PageID.165. Initially, she had no suspects. *Id.* However, after petitioner was arrested in December 18, 2000, Detective Clark received information that he was part of the family that lived at 1211 Beamus, the house police had gone to the night of the robbery. *Id.* at PageID.165-166. Clark noted that petitioner gave a false name when he was stopped by police, that his real name was Gregory Carter, and that she "recognized the name as being the Carter's living at that address." *Id.* at PageID.166. Given this information, Detectives Clark and Fannon interviewed petitioner at the jail. *Id.* at PageID.165-166. At that time, petitioner stated that he was not involved in the robbery. *Id.* at PageID.166. However, Clark noticed that Carter was wearing a black fleece coat that zipped in the front; the coat matched the description of the coat worn by the person who robbed the Speedway. *Id.* In addition, Clark checked the property found on petitioner when he was arrested, finding two gold hoop earrings and a partial pack of Kool cigarettes. *Id.* These items were

20

consistent with the victim's statement that the robber wore earrings in both ears and took a carton of Kool cigarettes.  *Id.*

Detective Clark arranged for live lineups.  *Id.* at PageID.167.  In the first lineup, conducted on October 10, 2000, in which petitioner did not appear, the victim did not identify anyone as the robber.  *Id.*  In the second lineup, in which petitioner appeared, the victim identified him as the robber.  *Id.*  At that point, Clark sought a warrant to charge petitioner with armed robbery.  *Id.*

After petitioner was charged and placed in jail, the prosecutor's office asked Detective Clark to monitor petitioner's incoming and outgoing mail.  *Id.* at PageID.167-168.  In one letter, dated January 3, 2001, addressed to "whom it may concern," petitioner stated that "this letter is to inform the judge, as well as the state's attorney that may be assigned to prosecute any cases against Mrs. Linda Carter or Mrs. Linda Abrams, I Gregory Carter take full responsibility, and, that any charges pending against Mrs. Carter or Abrams is not true."  *Id.* at PageID.168.  Petitioner's phone calls were also monitored, resulting in between six and nine hours of taped calls.  *Id.* at PageID.168-169.  Clark testified that petitioner spoke to several people in these taped calls, including Linda Carter (his wife), Irene Carter (his mother), and Mario Shanklin (cousin).  *Id.* at PageID.169.  The tapes included some conversations relevant to the investigation of the robbery. For instance, when discussing his arrest, petitioner told his wife that "[t]hey don't know nothing about you" and asked his wife if she had "move[d] those things."  *Id.* at PageID.170-171.  When petitioner's wife asked petitioner if there was anything else she needed to get rid of "at home," she inquired "No shells? None of that?"  *Id.* at PageID.171.  Petitioner then stated:

> "Let him come tear the motherfucker up.  They gonna do that anyway.  The reason why, they lookin' for a gun, they ain't got shit.  They trying' to make a motherfuckin'

case.  That's why they need the gun.  Hey, try to cash and -- or -- and go get rid of that.*"*

*Id.*

Detective Clark testified that the telephone conversations mentioned a person named Kenny, and that petitioner talked his cousin, Mario Shanklin about going and getting some stuff from Kenny.  *Id.*  When speaking to Mario, petitioner said, "you give them people what they want, I Goddamn guarantee you'll go to jail."  *Id.* at PageID.172.   In another conversation, petitioner threatened to kill his wife stating:

"When I get out, I'm going to kill yo mother fuckin' ass, you know that; don't you .  .  .   Who gonna take care of your baby? Keep you mother fuckin' mouth closed."

*Id.*

Petitioner also spoke to a woman named Joyce (his sister), asking her for a favor regarding Linda (his wife):

"This bitch, Linda, the state's attorney, they gonna bring charges against this bitch. I don't want this whoe to know none of my business.  Tell Mario he get in.  I said in. Go over to Kenny's house and get that shit."

*Id.*

On cross-examination, Detective Clark acknowledged that petitioner never mentioned hiding the gun used in the robbery and that the police did not search petitioner's wife's house.  *Id.* at PageID.173.  The detective explained that all the information from the phone conversations indicated that evidence was left at "Kenny's house."  *Id.*  Clark also acknowledged that the quality of the audiotapes was not good, and that at times, a listener could not make out full sentences.  *Id.*

   **B.      The defense**

The defense did not present any witnesses or evidence.  *Id.* at PageID.175.  During closing argument, petitioner's trial counsel argued, among other things: that the prosecution had not met its burden; that the victim mis-identified petitioner as the robber; that the man on the video tape was not petitioner; that petitioner knew his telephone conversations were being monitored; that petitioner's telephone conversations did not refer to a gun as evidence in an armed robbery; that the "stuff" referred to in the telephone conversations probably did not mean "a gun" but could have meant drugs or "evidence of an affair"; that there was no fingerprint evidence linking petitioner to the crime; and, that there were other suspects.  *Id.* at PageID.176-179.

### III.   Discussion

To determine whether petitioner demonstrated actual prejudice sufficient to excuse the procedural default, "courts must ask, is there a reasonable probability that a different (e.g., properly selected) jury would have reached a different result, a probability sufficient to undermine confidence in the outcome of the trial." *Ambrose IV*, 801 F.3d at 578 (internal quotation marks omitted).  "The most important aspect to the actual prejudice inquiry is the strength of the case against the defendant, which requires courts to take a careful look at the transcripts involved."  *Id.* at 580 (internal quotation marks and brackets omitted).  Actual prejudice does not exist where the trial transcript showed that the prosecution's case against the petitioner was so strong, and the defense was so weak, "that a court would consider it highly improbable that an unbiased jury could acquit."  *Id.* at 575, quoting *Ambrose II*, 684 F.3d at 652.

After reviewing the trial transcript in detail, the Court concludes that petitioner has failed to demonstrate actual prejudice necessary to excuse his procedural default.  The prosecution's

case against petitioner was strong.  At sentencing, the trial judge described the evidence against

petitioner as "overwhelming":

> I presided at the trial.  It was a trial in which Mr. Carter was convicted by, I think you'd have to say overwhelming evidence.  There was, among other things, a videotape of the robbery, and while such videotapes tend to be of rather poor quality, this one was excellent, and it showed very clearly Mr. Carter robbing this particular convenience store.

Sent. Trans. at PageID.190.

In addition to the videotape, the victim did not waver in her description or

identification of petitioner as the robber.  As discussed, the victim clearly saw the robber, heard him

speak, and watched him leave the store.  The government's other evidence was consistent with the

victim's eyewitness identification of petitioner as the robber. When arrested, petitioner possessed a

black fleece coat which zipped in front and two hoop earrings as described by the victim.  Trial Trans.

I at PageID.166; Trial Trans. II at PageID.148.  In addition, petitioner had a pack of Kool cigarettes,

the same brand which the robber stole from the store.  Trial Trans. I at PageID.166; Trial Trans. II at

PageID.144.  Finally, petitioner's jail conversations indicated that he did not want the authorities to

discover a gun, which they needed to make their "case" against him.  Trial Trans. I at PageID.171.

Given the other evidence, the jury could infer that petitioner was referring to the pistol used to rob

the victim.  Trial Trans. II at PageID.134.

In contrast to the prosecution, defendant presented no evidence.  In closing argument,

petitioner's counsel presented a defense theory that the victim incorrectly identified petitioner as the

robber, that petitioner was not the man in the Speedway videotape, and that the prosecutor's other

evidence proved nothing. "[T]o successfully argue that it is reasonably probable that a different jury

would have accepted the defense theory, and thus have reached a different result, a defendant must

show that there is some support for that theory." *Ambrose IV*, 801 F.3d at 581.   Here, petitioner presented no evidence to support his theory of misidentification.   The thrust of petitioner's claim is that the victim's identification was wrong because it involved cross-racial identification.  Petitioner's Supplemental Brief (docket no. 72, PageID.577).   However, petitioner presented no evidence to support this claim, admitting that "Mr. Carter's trial did not include testimony from an expert on the unreliability of cross-racial identifications." *Id.*

In summary, the evidence presented at trial does not create a reasonable probability that a different jury would have reached a different result.  *Ambrose IV*, 801 F.3d at 578, 581. Petitioner has failed to demonstrate actual prejudice sufficient to excuse the procedural default. Accordingly, the petition should be denied.

## IV.    Recommendation

I respectfully recommend that the habeas petition be **DENIED**.  Rule 8, Rules Governing § 2254 Cases in the United States District Courts.

Dated:  December 14, 2016                    /s/ Ray Kent
                                             RAY KENT
                                             United States Magistrate Judge

ANY OBJECTIONS to this Amended Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.   All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).